UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

The Antioch Co.,

Plaintiff,

vs. ORDER

Scrapbook Borders, Inc., Lisa DeBonoPaula a/k/a Lisa dePaula, and Luis DeBonoPaula d/b/a Solrac Enterprises,

Defendants. Civ. No. 02-100 (RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 5th day of September, 2003.

## I. Introduction

This matter came before the undersigned Magistrate Judge pursuant to the consent of the parties, made in accordance with Title 28 U.S.C. §636(c), upon the Plaintiff's Motions for Partial Summary Judgment, in which it seeks Judgment, as a matter of law, that the Defendants are liable on the Plaintiff's claim of copyright infringement, and also seeks Judgment on three of the Defendants' Counterclaims. A Hearing on the Motion was conducted on June 13, 2002, at which time, the Plaintiff appeared by Gina M. Tiefenthaler, Esq., and the Defendants Lisa DeBonoPaula ("DeBonoPaula"), Luis

83

cc: all counsel

FILED SEP - 5 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JCB

DeBonoPaula, and Scrapbook Borders, Inc. ("Scrapbook"), appeared by Christopher K. Sandberg, Esq.

For reasons which follow, we grant the Plaintiff's Motion for Summary Judgment on the issue of copyright infringement liability, except to the extent that the Motion seeks the entry of a Permanent Injunction, which we deny, but without prejudice. We also grant, in its entirety, the Plaintiff's Motion for Summary Judgment on the Defendants' First, Second, and Fourth Counterclaims.

## II. Factual and Procedural History

In this action, the Plaintiff brought claims against the Defendants for copyright infringement, unfair competition, and deceptive trade practices, and against DeBonoPaula and Scrapbook, for business disparagement. The claims arise from allegations that certain "Idea Books," and CD-ROM products, which were published and sold by the Defendants, contained stickers which had been copyrighted by the Plaintiff, thereby infringing upon the Plaintiff's protected rights. In addition, the Complaint alleges that the Defendants engaged in unfair competition by their unauthorized use of trademarked materials, and that DeBonoPaula, under her own name, and under the name of Scrapbook, disparaged the Plaintiff's business by posting false and misleading representations of fact, concerning the Plaintiff, on Scrapbook's website, and in Internet chat rooms. The Defendants have denied any wrongdoing, and have assert-

ed Counterclaims, against the Plaintiff, for abuse of copyright, for the violation of Minnesota antitrust and consumer fraud laws, and for violation of labor laws concerning the payment of commissions to sales persons.

III. Discussion

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Duffy v. Wolle, 123 F.3d 1026, 1040 (8th Cir. 1997), cert. denied, 523 U.S. 1137 (1998). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn therefrom, in a light most favorable to the nonmoving party, and have found no triable issue. See, Eide v. Grey Fox Technical Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003); Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003); United Fire & Casualty Ins. Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003). For these purposes, a disputed fact is "material," if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fenney v. Dakota, Minnesota & Eastern R.R. Co.,

327 F.3d 707, 711 (8th Cir. 2003); Jenkins v. Southern Farm Bureau Casualty, 307 F.3d 741, 744 (8th Cir. 2002); Herring v. Canada Life Assurance Co., 207 F.3d 1026 (8th Cir. 2000).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Bell

Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995); Settle v. Ross, 992 F.2d 162, 163 (8th Cir. 1993).

A. The Plaintiff's Motion for Partial Summary Judgment on the Issue of Copyright Infringement Liability.

The Plaintiff seeks a Judgment that, as a matter of law, the Defendants are liable for copyright infringement. Based on such a finding, it also seeks an Order that permanently enjoins the Defendants from further publishing, importing, distributing, or selling, any of their products which display the Plaintiff's original sticker designs. Notably, however, the Plaintiff's Motion seeks Summary Judgment only as to the issue of liability for copyright infringement, and not as to the issue of damages or willfulness, as the Plaintiff wishes to reserve those issues for a Jury Trial.[1] In response, the Defendants claim that granting Summary Judgment on anything less than a whole claim is procedurally improper. Additionally, the Defendants assert that, even if it were proper to award Summary Judgment on less than the whole of a claim,

---

[1]The remedies available for copyright infringement are contained in Title 17 U.S.C. §504. Under that provision, the aggrieved party may elect to recover the actual damages and profits of the infringer, or to recover statutory damages. See, Section 504(a). If the copyright owner can prove willful infringement, the maximum statutory damages, which may be awarded, increases from $30,000.00 to $150,000.00. See, Section 504(c).

they are entitled to Summary Judgment, even though they filed no such Motion, because of the fair use exception to copyright liability.[2] We first address the procedural propriety of the Plaintiff's Motion, and then, after finding no impropriety, we proceed to the merits of the Motion.

1. Whether the Plaintiff's Motion for a Partial Summary Judgment Motion is Procedurally Proper.

In support of its contention, that granting Summary Judgment solely on the liability issue is procedurally proper, the Plaintiff points first to Rule 56(c), Federal Rules of Civil Procedure, which provides, in pertinent part, that "[a] summary judgment, interlocutory in character, may be rendered on the issue of

---

[2]Although the Plaintiff objected to the Defendants' argument, that the Court should consider granting Summary Judgment in favor of the Defendants, because the Defendants had not formally filed such a Motion, we agree with the Defendants that such a result is permissible under the law of this Circuit. Our Court of Appeals has recently reiterated that a Court might properly grant Summary Judgment, in favor of the non-moving party, even if the Court does so, sua sponte, as long as "the losing party was on notice that she had to come forward with all of her evidence." Lerohl v. Friends of Minnesota Sinfonia, 322 F.3d 486, 492 (8th Cir. 2003), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Here, the Defendants' brief placed the Plaintiff on notice that the Defendants also sought the entry of Summary Judgment, and the Plaintiff was afforded an opportunity to address that question in its Reply Memorandum. As a result, if we should find that there are no genuine issues of material fact precluding Summary Judgment, and that the law compels a Judgment for the Defendants, there is no procedural bar to the grant of such Judgment, under the circumstances here.

liability alone although there is a genuine issue as to the amount of damages." The Plaintiff contends that the plain language of Rule 56 contemplates the type of Summary Judgment Motion that it has filed. The Plaintiff also points to our Court of Appeals' holding, in Cass County Music Co. v. C.H.L.R., Inc., 88 F.3d 635 (8th Cir. 1996), where the District Court granted Summary Judgment in favor of the copyright holding plaintiff, and awarded statutory damages.

There, on appeal, the defendant did not dispute the finding of liability, but asserted that there remained a question of material fact as to the willfulness of the infringement, which precluded the statutory damages award, and that it was entitled to a Jury Trial on that factual issue. While finding that there were no material questions of fact as to willfulness, the Court of Appeals, nevertheless, found that it was error for the District Court to strike the defendant's Jury demand, because the remedy for statutory damages was legal, rather than equitable in nature and, as such, "either party in a copyright infringement suit is entitled under the Seventh Amendment to a jury trial on demand." Id. at 644. As a consequence, the Court remanded the action for "a new trial, with jury, on the * * * claim for statutory damages." Id.

The Defendants have offered nothing to counter the Plaintiff's arguments, apart from an enigmatic suggestion that it would be more

expeditious to resolve the liability issue at Trial, than by way of a dispositive Motion, even though the Defendants also seek a Summary Judgment, in their favor, on the copyright liability issue. We find no merit to the Defendants' invitation, that we not consider the Plaintiff's Motion, because it would be more efficient to resolve that issue at Trial. Both parties concede that there are no genuine issues of material fact which would preclude a finding of liability, as a matter of law -- at least in their respective favor -- making that issue ripe for summary resolution.

Accordingly, we concur with the Plaintiff, that a less than full adjudication is permissible, and especially so, on the issue of liability, while leaving the issue of damages for Trial. Rule 56 plainly contemplates such a course of action. We also agree that, under the guarantees of Seventh Amendment to the Constitution, the Plaintiff is entitled to a Jury Trial on the issue of damages, upon a finding of liability for copyright infringement. See, Cass County Music Co. v. C.H.L.R., supra; see also, Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 355 (1998)("[W]e hold that the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under [Section] 504(c) of the Copyright Act, including the amount itself."); See also, Bar-Meir v. North American Die Casting Assoc., 55 Fed.Appx. 389, 2003 WL 23306 (8th Cir., January 3,

2003)(defendant who had made proper Jury demand was entitled to Jury Trial on issue of damages). As a result, we find no procedural deficiency in the Plaintiff's Motion, and proceed to consider the Motion on its merits. See, e.g., Mulcahy v. Cheetah Learning LLC, 2003 WL 21909570 at *2 (D. Minn., July 28, 2003)(granting Summary Judgment, in copyright action, "with respect to liability, but not actual damages.").

2. The Merits of the Liability Motion. In order to prevail on a copyright infringement claim, a copyright owner must prove both that it is the owner of a valid copyright, and that the defendant duplicated that copyrighted work. See, e.g., Taylor Corp. v. Four Seasons Greetings LLC, 171 F.Supp.2d 970, 972 (D. Minn. 2001), citing Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 941 (8th Cir. 1992). Here, the Defendants concede that both of those elements have been met, and they do not deny that the Plaintiff has established a prima facie claim of copyright infringement.[3] Rather, the Defendants maintain that their copying

[3]As conceded by defense counsel:

> Superficially on Plaintiff's Motion for Summary Judgment, they're right. They win[,] [i]f it's not a fair use because we used them [i.e., the Plaintiff's stickers]. We used them. They're theirs. We sold them. They are out in the world. We can't claim we didn't do it. Didn't have permission, didn't

(continued...)

of the Plaintiff's copyrighted materials was a fair use, such that their admitted copying would not subject them to liability for copyright infringement. The Plaintiff disagrees, and asserts that, as a matter of law, the Defendants' use of its copyrighted materials was not "fair." Most notably, both parties agree that there are no genuine issues of material fact which would preclude the entry of Summary Judgment.[4]

a. Standard of Review. Fair use is an "equitable rule of reason," Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 448 (1984), which may be asserted as an affirmative defense to a claim of copyright infringement, thereby re-

---

[3](...continued)
have a license. Those facts are agreed to. Transcript of Hearing on June 13, 2003, at p. 32 [Tr. at 32].

[4]As expressed by defense counsel, during the course of the Hearing on the Motions:

> This is, as your Honor noted[,] a case with many interesting issues, but as to the copyright issue I think which is interesting to me is for the first time that I've ever defended a summary judgment motion. I'm not going to stand here and say there's any disputed facts. I don't think [there] are. I think this is now a nice legal question. The parties have put together a factual record that is as good as it is going to get.
>
> We aren't fighting about it and your Honor is pretty much able to take it and apply the law [to] the facts and give us an answer.

Tr. at 31.

quiring the party, who claims that its use was fair, to carry the burden of proof as to all of the issues in dispute. See, Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994)(noting that, because fair use is an affirmative defense, the proponent of such a defense has the burden of demonstrating fair use). "Fair use is a mixed question of law and fact," Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560 (1985), which means that it "may be resolved on summary judgment if, a reasonable trier of fact could reach only one conclusion." Narell v. Freeman, 872 F.2d 907, 910 (9th Cir. 1989); see also, Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1115 (9th Cir. 2000)("If there are no genuine issues of material fact, or if even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work."); Belmore v. City Pages, Inc., 880 F.Supp. 673, 677 (D. Minn. 1995)("If, after applying the four factors, there are no material factual disputes, fair use may be resolved on summary judgment."), citing Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148, 1151 (9th Cir. 1986), and Wright v. Warner Books, Inc., 953 F.2d 731 (2nd Cir. 1991).

The doctrine of fair use has existed "[f]rom the infancy of copyright protection," as there has always been the need for "some

opportunity for fair use of copyrighted materials," in order "to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" Campbell v. Acuff-Rose Music, Inc., supra at 575, quoting United States Constitution, Art. I, §8, cl. 8. The Supreme Court has explained the need for a fair use exception to copyright laws as follows:

> For as Justice Story explained, "[i]n truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." Emerson v. Davies, 8 F.Cas. 615, 619 (No. 4,436)(CCD Mass. 1845). Similarly, Lord Ellenborough expressed the inherent tension in the need simultaneously to protect copyrighted material and to allow others to build upon it when he wrote "while I shall think myself bound to secure every man in the enjoyment of his copy-right, one must not put manacles upon science." Carey v. Kearsley, 4 Esp. 168, 170, 170 Eng.Rep. 679, 681 (K.B. 1803).

Campbell v. Acuff-Rose Music, Inc., supra at 575-76. Although, when enacted in 1790, the United States' first Copyright Act did not include a reference to fair use, "the doctrine was recognized by the American courts nonetheless." Id. at 576.

The fair use doctrine was finally codified, in the Copyright Act of 1976, Title 17 U.S.C. §107, which provides, in pertinent part, as follows:

> [T]he fair use of copyrighted work, * * * for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include -- (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

In codifying the fair use doctrine, Congress clarified that it meant "'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way,' and intended that courts continue the common-law tradition of fair use adjudication." Campbell v. Acuff-Rose Music Corp., supra at 577, quoting H.R.Rep. No. 94-1476, p. 66 (1976), see also, S.Rep No. 94-473, p. 62 (1975). "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which the law is designed to foster.'" Id., quoting Stewart v. Abend, 495 U.S. 207, 236 (1990). In considering the enumerated factors, the Supreme Court has instructed that "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." Id. at 578.

In the final analysis, the task of ascertaining a fair use "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for a case-by-case analysis." Campbell v. Acuff-Rose Music, Inc., supra at 577; citing Harper & Row, Publishers, Inc. v. National Enterprises, supra at 560.

b. Legal Analysis.

1) Purpose and Character of the Use.

a) Standard of Review. As to the first factor in the fair use inquiry, namely, the character and purpose of the Defendants' use of the Plaintiff's copyrighted materials, and whether that use was of a commercial, as opposed to a nonprofit educational purpose, the Supreme Court has instructed that we are to be guided by the examples given in the preamble to Section 107, and should look to whether the use of the copyrighted material was for "criticism, comment, news reporting, teaching, * * * scholarship, or research." The central purpose of that inquiry is to see, "in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation" "or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." Campbell v. Acuff-Rose Music Inc., supra at 579; see also, Sundeman v. Seajay Society, Inc., 142 F.3d 194, 202 (4th Cir. 1998); Mattel, Inc. v. Pitt, 229 F.Supp.2d 315, 321 (S.D.N.Y. 2002). More suc-

cinctly, we are to ask "whether and to what extent the new work is 'transformative.'" Id.

In order for a use to be considered transformative, "'[t]here must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work.'" World Wide Church of God v. Philadelphia Church of God, Inc., supra at 1117, quoting Folsom v. Marsh, 9 F.Cas. 342, 344-45 (C.C.D. Mass. 1841); see also, Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 142 (2nd Cir. 1998)(work is transformative when copyrighted material is "transformed in the creation of new information, new aesthetics, new insights and understandings."). Thus, "where the 'use is for the same intrinsic purpose as [the copyright holder's] * * * such use seriously weakens a claimed fair use." Id., quoting Weissmann v. Freeman, 868 F.2d 1313, 1324 (2nd Cir. 1989).

Although transformation is not a sine qua non to a finding of fair use, a copyright's goal of promoting the growth of art and science is best "furthered by the creation of transformative works," Sony Corp. of America v. Universal City Studios, Inc., supra at 455 n. 40, which "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copy-

right." Campbell v. Acuff-Rose Music Corp., supra at 579, citing Sony Corp. of America v. Universal City Studios, Inc., supra at 478-80 (Blackman, J., dissenting). Indeed, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Id.

Even if we do find that the Defendants' use of the Plaintiff's copyrighted material was highly transformative, we must also consider the other elements of the first factor's "purpose and use" inquiry. As part of that inquiry, we must look to whether the use was commercial in nature, or was a non-profit, educational use. While "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright," Sony Corp. of America v. Universal Studios, Inc., supra at 451, it is important to remember that, in enacting the Copyright Act, "Congress resisted attempts to narrow the ambit of the traditional enquiry by adopting categories of presumptively fair use," and therefore, "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness." Campbell v. Acuff-Rose Music Corp., supra at 584, citing Sony Corp. of America v. Universal City Studios, Inc., supra at 448-49 (finding that the commercial or non-

profit educational character of use is one fact to be weighed along with others in fair use assessment). "[B]ecause nearly all authors hope to make a profit with their work, courts should be wary of placing too much emphasis on the commercial nature in a fair use determination." Robinson v. Random House, Inc., 877 F.Supp. 830, 840 (S.D.N.Y. 1995). As a result, "[t]he crux of the profit/ non-profit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row Publishers, Inc. v. Nation Enterprises, supra at 562.

b) Legal Analysis. To provide some dimension to the issues presented, it may be helpful to describe the parties' competing products. The Plaintiff publishes, and sells, a series of pictorial stickers which are thematic in appearance. For example, a sheet of the Plaintiff's stickers might contain decals which depict campsite objects, and utensils, such as a tent, a campfire, cooking gear, and the like. Using those stickers, the buyer can create a camp scene which has the appearance of an artwork. The Defendants' Idea Books demonstrate how the Plaintiff's stickers can be displayed, not abstractly, but as visual depictions which include, in some instances, stickers from different schematic sheets, which are published under the Plaintiff's

copyrights. The Defendants argue that, in demonstrating the artistic potential of the Plaintiff's stickers, they not only promote the purchase of the Plaintiff's product, but also offer, for purchase, a differently appearing product, as they are not simply selling a sheet of Plaintiff's thematically-united stickers, but a product which displays the stickers so as to portray a scenic portrayal. Not surprisingly, the Plaintiff disagrees, and notes that the Defendants not only sell their own pictorial stickers, but that the Plaintiff also sells its own idea books which display its own stickers in scenic arrays.

According to the Defendants, their "Idea Books are a straightforward example of transformative works," that utilize "the functional and utilitarian individual stickers," that are created by the Plaintiff, in such a way as to "create a new and completely different artistic work;" namely, a book which teaches people how to create scrapbook borders. Defendants' Memorandum in Opposition to Motions for Summary Judgment, at 11. The Defendants also assert that they created the Idea Books in order to teach people how to make decorative border designs, and that such a use is an educational, and therefore, productive use, which "result[s] in some added benefit to the public beyond that produced by the first author's work." Sony Corp. of America v. Universal Studios, Inc., supra at 478. Accordingly, the Defendants argue that we should

find that the first factor weighs in favor of a finding that their use of the copyrighted materials is fair.

The Plaintiff, on the other hand, argues that the Defendants have simply "engaged in wholesale copying," and have presented the Plaintiff's copyrighted works in a way that does nothing to transform those materials, or to create some public benefit, by presenting "new or novel" ways to use its products. The Plaintiff maintains that there is nothing new, or novel, about the Defendants' use of its copyrighted stickers, as the Plaintiff has been publishing its own idea books for years. According to the Plaintiff, the Defendants did nothing more than "avoid[] the drudgery in working up something fresh and new (such as their own artwork)," by "hav[ing] blithely taken that which belongs to someone else for personal gain." Reply Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment as to Liability for Copyright Infringement, at 7, citing Campbell v. Acuff-Rose Music Inc., supra at 580.

Before considering whether the Defendants' use was transformative, we recognize that we are, to some extent, comparing apples to pears here, as the Defendants' use of the Plaintiff's stickers is one step removed from direct infringement of the Plaintiff's product. The Defendants did not copy the Plaintiff's sticker designs onto stickers, which they then sold as their own, but instead, they

used the Plaintiff's sticker designs in order to create decorative scrapbook pages, which they then sold to consumers. Nevertheless, such a use can be found to infringe upon the Plaintiff's sticker copyrights, if the Defendants' Idea Books are a derivative use of those stickers.

One part of the bundle of rights, which are passed to a copyright holder, is the right to "prepare derivative works based upon the copyrighted work." Title 17 U.S.C. §106(2). A derivative work is a "work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." Title 17 U.S.C. §101.[5] Here, we find that the Defendants' Idea Books are derivative works of the Plaintiff's stickers, as they are essentially a recasting of the stickers, in a compilation.

---

[5]We note that the use of "transformed," in this context, is not the same as the using the word "transformative," as that term is used in the first element of the fair use test. See, Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 143 (2nd Cir. 1998). "Although derivative works that are subject to the author's copyright transform an original work into a new mode of presentation, such works -- unlike works of fair use -- take expression for purposes that are not 'transformative.'" Id.

The decision of the United States Court of Appeals for the Seventh Circuit, in Ty, Inc. v. Publications International, Ltd., 292 F.3d 512 (7th Cir. 2002), is instructive on the issue of derivative works. There, the manufacturer of Beanie Babies initiated a copyright action against a book publisher who had published a number of books containing photographs of the Beanie Babies. The Court related that, absent the concept of derivative rights, those books would clearly be fair use, because the books would not be a substitute for the toy itself, as "[n]o one who wants a Beanie Baby, whether a young child who wants to play with it or an adult (or older child) who wants to collect Beanie Babies, would be tempted to substitute a photograph." Id. at 518-19. The parties conceded that photographs of the Beanie Babies were derivative works, however, because there was a secondary market for such works, which the copyright holder might wish to exploit. Therefore, a person who sold photographs of the Beanie Babies, without a license, infringed upon the copyright holder's copyright in the Beanie Baby.

Not every unlicenced use of a photograph of a Beanie Baby would necessarily constitute an unfair use, however. The picture book, which was simply a collection of photographs of Beanie Babies, was a derivative work, but a collector's guide was not. In a useful example, the Court explained that a guide to restaurants

did nothing to transform, recast, or adapt the restaurants it featured, and therefore, was not derivative, and likewise, the collector's guide, with its textual portions providing useful tips to the collector, and criticism of the toy manufacturer, did nothing to transform, recast, or adapt the toys featured therein, and therefore, was also not derivative. Id. at 521.

The Defendants' Idea Books are comparable to the book containing photographic representations of Beanie Babies, together with simple comments about the characteristics of those toys. Unlike the consumer guide books, which are "critical and evaluative as well as purely informational," and which do nothing to "recast, transform, or adapt the things to which they are guides," the Defendants' Idea Books do not critique or evaluate the stickers displayed inside, but simply present them as a decorative compilation.[6] Accordingly, we find that the Idea Books are derivative of

[6]The Defendants disagree, and assert that their books also contain instructive text, as did the consumer guide books, and that, as a result, their Idea Books are complementary, and not infringing uses of the Plaintiff's copyrights. We cannot agree. The contents of the Defendants' Idea Books simply list the items displayed on a page, and contain nothing that is evaluative, or in the nature of a critical commentary. Further, the Defendants' argument, that their Idea Books promote the purchase of the Plaintiff's stickers, is only partially correct for, as the Plaintiff underscores, it also sells idea books, which also employ its own stickers. Again, its copyrights should allow the Plaintiff to enjoy the derivative uses of those copyrights, and not inure to the competing benefit of the Defendants.

the Plaintiff's copyrighted stickers.

Even if the Idea Books are derivative of the Plaintiff's copyrighted stickers, the Defendants' books might still be transformative, which would still qualify as a fair use. However, we are unable to find that the Defendants' use is transformative or, if it is, it is only inappreciably so. The Defendants' use of the Plaintiff's stickers, in their Idea Books, is "for the same intrinsic purpose" as the Plaintiff's use, and therefore, does not weigh strongly towards a finding of fair use. See, Weissmann v. Freeman, supra at 1324. The Plaintiff also publishes its own idea books, in which it utilizes only its own stickers, and has been publishing those books prior to when the Defendants published their own Idea Books. While we cannot deny that there was more to what the Defendants did in creating their books, than "the facile use of the scissors," the result reached was not transformative. World Wide Church of God v. Philadelphia Church of God, Inc., supra at 1117.

In so concluding, we make no subjective judgment as to quality of the Defendants' creations, as that is not our function. See, Campbell v. Acuff-Rose Music, Inc., supra at 582 ("As Justice Holmes explained, '[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work] * * *.'"), quoting Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903); Twin Peaks Produc-

tions, Inc. v. Publications International, Ltd., 996 F.2d 1366, 1374 (2nd Cir. 1993)("Courts must be alert to the risk of permitting subjective judgments about quality to tilt the scales on which the fair use balance is made."). Instead, we base our decision solely on the fact that the Idea Books, which were created by the Defendants by use of the Plaintiff's copyrighted stickers, simply employed those stickers as they were designed to have been employed, and in a manner already applied by the Plaintiff.

We do agree with the Defendants, however, that the transformative process extends along a spectrum. See, e.g., Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., supra at 143 (finding that the development of "The Seinfeld Aptitude Test" required some creative work, but was "far less transformative than other works."). At one end of the spectrum is a use that is not transformative, but is derivative, such as would arise if the Defendants had simply duplicated a sheet of the Plaintiff's stickers, and sold them as their own. At the other end of the scale is a use that is highly transformative, and not derivative, such as would be presented if the Defendants developed some new, or innovative use of the Plaintiff's sticker sheets, such as affixing them in such a way as to merge their individual identities in order to create a mosaic portrait of Abraham Lincoln.

On that spectrum, we find that the Defendants' use of the Plaintiff's stickers is in close proximity to the "not transformative, but is derivative" end, as the Defendants simply appropriated the stickers for a purpose that was not distinct from the sticker's intended purpose -- namely, to create a pictorial representation in which the stickers would not lose their individual identities. Moreover, the Defendants' use replicates that of the Plaintiff, which also offers idea books for sale, using its own stickers. Quite simply, the Defendants' use adds little that is "new, with a further purpose or different character [thus] altering the first with new expression, meaning, or message," and therefore, we conclude that the Defendants' use is only inappreciably transformative, if it is transformative at all. Sundeman v. Seajay Society, Inc., supra at 202, quoting Campbell v. Acuff-Rose Music. Inc., supra at 578-79.

"Although such transformative use is not absolutely necessary for a finding of fair use," "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Campbell v. Acuff-Rose Music, Inc., supra at 579, citing Sony Corp. of America v. Universal City Studios, Inc., supra at 455 n.40. "Congress has plainly instructed us that fair use analysis calls for a sensitive balancing of interests." Sony Corp. of America v. Universal City

Studios, Inc., supra at 455 n. 40. As a result, our analysis turns to a consideration of the commercial versus non-profit educational nature of the Defendants' works. As to this inquiry, the Defendants maintain that their use is "for the sole purpose of teaching" consumers how to make scrapbook borders, and that, while they admittedly sought, and enjoyed, some financial gain from the sale of their books, their strong educational purpose militates against pure commercialism.

The Defendants further argue that, because "the overall vitality" of their Idea Books does not rest on the use of the Plaintiff's stickers -- which are employed in only about thirty-two percent of the books -- but upon their display of those stickers, together with stickers from other companies, as well as other decorative materials. As a consequence, the Defendants maintain that, even if we were to find that the commercial nature of the Defendants' use was significant, we should, nonetheless, conclude that their profit was not generated by any direct use of the Plaintiff's stickers, but by their own creative efforts.

The Plaintiff flatly rejects the Defendants' characterization of their Idea Books as educational. The Plaintiff points to the deposition testimony of DeBonoPaula, in which she admitted that the Idea Books were created in order to generate profits. See, Exhibit A attached to Affidavit of Gina Tiefenthaler. According to the

Plaintiff, the mere fact that the Defendants may employ the books for some teaching purpose does not weigh in favor of a finding of fair use, as the Defendants' overriding purpose was a commercial one. Further, the Plaintiff questions whether the books could even qualify as being instructional, and describes them as more illustrative, since they merely depict completed border designs, and do not offer instruction as to how a person could actually produce such a design.

As we have previously noted, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row Publishers, Inc. v. Nation Enterprises, supra at 562. Here, we conclude that the commercialism factor weighs against a finding that the Defendants' use was fair. When developing their Idea Books, the Defendants might have had legitimate educational purposes in mind,[7] which were not to the exclusion of their interest in deriving a profit. Nevertheless, the Defendants plainly benefitted, financially, from their use of the Plaintiff's

---

[7]In her Affidavit, DeBonoPaula avers that, while she was employed as a consultant for the Plaintiff, she taught people how to make scrapbooks with the Plaintiff's stickers and, in order to be more effective in selling the Plaintiff's products, she developed designs for sticker scrapbook pages. Affidavit of Lisa DeBono-Paula, at ¶3.

stickers, without having to pay for the right to do so. Of course, we understand the Defendants to complain that any financial benefit has been misstated, because they believed that their profit was not a result of utilizing the Plaintiff's stickers, as their Idea Books did not solely include the Plaintiff's copyrighted stickers, and because people did not purchase the Idea Books in order to secure the Plaintiff's stickers, but only to obtain design ideas employing those stickers.

We are unable to agree. The Plaintiff underscores that its artwork was obtained, "at a considerable expense," since it had to pay artists to design, and license, those stickers, and has submitted evidence showing that, in marketing their Idea Books, the Defendants expressly advertised that they employed the Plaintiff's stickers. See, e.g., Exhibit 10 attached to Affidavit of Gina M. Tiefenthaler in Support of Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Issuance of an Order for Preservation of Records and Defendants' Response to Plaintiff's Motion to Expedite Discovery ("Tiefenthaler Preservation Affidavit"). While we cannot quantify the amount of that expense, it is readily apparent that the Defendants traded, in part, upon the Plaintiff's name, and product, in order to sell their Idea Books. Quite plainly, the Defendants stood "to profit from exploitation of the [Plaintiff's] copyrighted material without paying the customary price." Harper

& Row Publishers, Inc. v. Nation Enterprises, supra at 562. The Plaintiff paid for the development and use of the stickers, and the Defendants capitalized on those stickers, without having to pay any license fee, or other cost, and accordingly, we find that the first factor in the fair use equation, weighs heavily in favor of a determination that the Defendants' use of the Plaintiff's copyrighted materials was not fair. However, since all four of the statutory fair use factors "are to be explored, and the results weighed together, in light of the purposes of copyright," we proceed to a consideration of the remaining factors. Campbell v. Acuff-Rose Music, Inc., supra at 578.

2) The Nature of the Copyrighted Work.

a) Standard of Review. A consideration of the nature of the copyrighted work "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell v. Acuff-Rose Music, Inc., supra at 586. "[T]he law generally recognizes a greater need to disseminate (and thus provides lesser protection to) factual works than works of fiction or fantasy," Rubin v. Brooks/Cole Publishing Co., 836 F.Supp. 909, 919 (D. Mass. 1993), and as a result, "[t]he scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved." Hustler

Magazine, Inc. v. Moral Majority, Inc., supra at 1153-54; see also, Twin Peaks Productions, Inc. v. Publications International, Ltd., supra at 1376 (This factor, "if it favors anything, must favor a creative and fictional work * * *.").[8]

In considering this factor, we are to look at "whether the work is imaginative and original, or whether it represented a substantial investment of time and labor made in anticipation of a financial return." Id., citing MCA, Inc. v. Wilson, 677 F.2d 180, 182 (2nd Cir. 1981). "Although this factor may be of less (or even of no) importance when assessed in the context of certain transformative uses * * * the fictional," or creative, "nature of the copyrighted work remains significant in the instant case, where the secondary use is at best minimally transformative." Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., supra at 144.

---

[8] In considering this second factor, the Court is also to look at whether the work is published, or unpublished, because the right of first publication may also be implicated in the use of an unpublished work. Nunez v. Caribbean International News Corp., 235 F.3d 18, 23 (1st Cir. 2000), citing Harper & Row Publishers, Inc. v. Nation Enterprises, supra at 564. Here, all of the stickers, which the Defendants used in their Idea Books, were "published" by the Plaintiff, as they were already publically available. Thus, the scope of fair use is broader, than would be the case if the stickers had not yet been marketed. See, CSM Investors, Inc. v. Everest Development, Ltd., 840 F.Supp. 1304, 1313 (D. Minn. 1994) (noting that the scope of fair use is more narrow as to unpublished, than published works); citing Harper & Row Publishers, Inc. v. Nation Enterprises, supra at 564.

b) Legal Analysis. While the Defendants agree that the Plaintiff's stickers are works of art, they contend that the stickers are "largely dictated by functional considerations," and are closer to factual than to fictional works. As urged by the Defendants, the elements of the Plaintiff's copyrighted stickers "are not very original, but are rather generic-looking images of common items" and, because the law provides greater deference to fair use in the event that the copyrighted elements are not particularly creative or unique, we should allow a broad category of uses of the Plaintiff's stickers to qualify as being fair. Defendants' Memorandum in Opposition to Motions for Summary Judgment, at 15.

The Plaintiff responds by noting that, simply because its artistic work appears on paper with an adhesive backing and, to that extent, is functional in some sense, it is, nonetheless, creative, and artistic in character. The Plaintiff also discourages us from adopting the Defendants' description of the stickers as "not very original," and as consisting of "rather generic looking images of common items," urging that such a subjective assessment is not an appropriate consideration.

Given the Record presented, we are persuaded that the Plaintiff's copyrighted work is artistic and creative, as opposed to being factual, and that, as a result, this factor weighs against a

finding of fair use. While pictorial in appearance, the stickers are not mere photographs, but are artistic renditions, which capture the creativity of their designer. As such, the depictions are analogous to the fictional works, which are entitled to enhanced protection, Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1402 (9th Cir. 1997); Sundeman v. Seajay Society, Inc., supra at 204, as opposed to the photographic works, such as newsworthy videotapes, which elude the same protective intensity. See, Los Angeles News Service v. Reuters Television International, Ltd., 149 F.3d 987 (9th Cir. 1998); see also, Sony Corp. of America v. Universal City Studios, Inc., supra at 455 n. 40 ("Copying a news broadcast may have a stronger claim to fair use than copying a motion picture.").

The stickers were plainly the product of "creativity, imagination and originality," notwithstanding the fact that their design also allowed functional uses. Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., supra at 1402; see also, Worldwide Church of God v. Philadelphia Church of God, Inc., supra at 1118 ("[T]he creativity, imagination and originality embodied [in the copyrighted work] tilt the scale against fair use."). In sum, the functionality of the stickers does not overshadow, but complements their creativity, which counsels a narrower scope of fair use that weighs against a finding that the Defendants' use was fair.

3) Substantiality of the Portion of the Copyrighted Material Used.

a) Standard of Review. The third factor questions whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," "are reasonable in relation to the purpose of the copying." Campbell v. Acuff-Rose Music, Inc., supra at 586. In considering this factor, we are to look at both "the quantity and value of the materials used," Folsom v. Marsh, supra at 348, remembering that "the extent of permissible copying varies with the purpose and character of the use." Campbell v. Acuff Rose Music, Inc., supra at 586, citing Sony Corp. v. Universal City Studios, Inc., supra at 449-450. Accordingly, our analysis "must be a flexible one, rather than a simple determination of the percentage used." Nunez v. Caribbean International News Corp., 235 F.3d 18, 24 (1st Cir. 2000). "The facts bearing on this factor will also tend to address the fourth, by revealing the degree to which the [secondary use] may serve as a market substitute for the original or potentially licensed derivatives." Campbell v. Acuff-Rose Music, Inc., supra at 587.

Although many Courts have employed a short hand rendition of this factor, and have asked whether the extent of copying was consistent with, or was more extensive than necessary, in furthering the purpose and character of the use, we conclude that such an

approach unfairly adopts the analysis applied when considering a parody. A parody "necessarily springs from recognizable allusion to its object," and therefore, "must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." Campbell v. Acuff-Rose Music Co., supra at 588. However, "[o]nce enough has been taken to assure identification, how much more is reasonable will depend * * * on the extent to which the song's overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original." Id.

As to parody, a Court must balance whether the alleged infringer appropriated only enough of the copyrighted work to call to mind the original, but not so much as would run the risk of directly competing with the original in the marketplace. Here, though, the first part of that analysis is inapposite, and we focus, instead, on whether the quantity, and quality of the copied material, is sufficient to allow the allegedly infringing work to serve as a market substitute for the original, or for a protected derivative use of the original. Here, we find that the quantity, and quality of the material, which was appropriated by the Defendants, was sufficient to allow the Defendants' Idea Books to serve as a market substitute for the Plaintiff's derivative, idea books. In their Idea Books, the Defendants reproduced, in full color, substantial

portions of the Plaintiff's copyrighted stickers, albeit in the context of thematic scrapbook pages, which depict the stickers in the same themes for which they were designed.

We recognize that the parties disagree as to the amount of the copyrighted material that we should be considering. The Defendants maintain that they only used a small number of the Plaintiff's total sticker catalogue, while the Plaintiff counters that each of its stickers is copyrighted, so that the use of a single sheet of stickers, amounts to wholesale copying. We conclude that the proper unit to consider, as to the quantitative substantiality of the copying, is dictated by the copyright. Each of the Plaintiff's copyrights contains varying numbers of stickers, from as few as three, to well over fifty. While not every one of the Defendants' borders contains the whole complement of stickers covered under any one copyright, a great number of them use all, or the majority of, the stickers covered under a single copyright. As a result, it is clear that the quantity of the Plaintiff's stickers, which were used by the Defendants, is sufficiently substantial to elevate the Defendants' Idea Books as a market substitute for the Plaintiff's own idea books.

As to what, here, is the "heart" of the Plaintiff's work, we find that it is the sticker itself, as that is the creative, and artistic expression, which is protected by the copyright, as

coupled with the theme that is created by the combination of those stickers, into groupings for which they were designed, so as to create a particular scrapbook theme. The Defendants' use went to the heart of the Plaintiff's work, for they used the Plaintiff's stickers, in the exact manner for which they were intended to be used. As a result, there is a substantial likelihood that the Defendants' Idea Books would serve as a market substitute for the Plaintiff's own, derivative, idea books. In sum, we find that this factor also weighs against a finding that the Defendants' use was fair.

4) The Effect of the Use Upon the Potential Market or Value of the Copyrighted Work.

a) Standard of Review. Under this factor, a Court must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant * * * would result in a substantially adverse impact on the potential market' for the original." Campbell v. Acuff-Rose Music, Inc., supra at 590, quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright, at Section 13.05(A)(4)(1993). This factor "is concerned with secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright-holder." Infinity Broadcast Corp. v. Kirkwood, 150

F.3d 104, 110 (2nd Cir. 1998). In other words, we "must take account not only of harm to the original but also of harm to the market for derivative works." Harper & Row Publishers, Inc. v. Nation Enterprises, supra at 568.

b) Legal Analysis. In our view, the Defendants' use of the Plaintiff's stickers would have little adverse impact on the sale of those stickers, and could be viewed as promotional to the sale of the stickers, themselves. If a purchaser of the Defendants' Idea Books wants to duplicate the Plaintiff's stickers, he or she would have to purchase them at a retail outlet, which is entirely controlled by the Plaintiff. However, with respect to the derivative market, we conclude that "unrestricted and widespread conduct of the sort engaged in by the defendant * * * would result in a substantially adverse impact on the potential market" for such works. 3 M. Nimmer & D. Nimmer, Nimmer on Copyright, supra at §13.05(A)(4). Our conclusion derives, in part, from our finding that the Defendants' use is only minimally transformative. "[W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects,' Folsom v. Marsh, supra at 348, of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur," "[b]ut when, on the contrary, the second use is transformative, market

substitution is at least less certain, and market harm may not be so readily inferred." Campbell v. Acuff-Rose Music, Inc., supra at 591, citing Sony Corp. of America v. Universal City Studios, Inc., supra at 451. Since the Defendants' use was not highly transformative, there is a substantial likelihood that the Defendants' use will serve as a market replacement for the original, and that harm to that market will occur.

At the time of the Hearing, the Defendants maintained that their Idea Books would not compete in the market place with the Plaintiff's idea books, as the Defendants' books were available in retail outlet stores, while the Plaintiff's books were only available through an authorized sales agent of the Plaintiff, as is the case with the Plaintiff's stickers. However, if the Defendants' books are available at a scrapbooking store, and a buyer purchases one to obtain ideas on how to create decorative scrapbook pages, and finds a suitable design that utilizes the Plaintiff's stickers, even if that buyer contacted one of the Plaintiff's representatives to purchase the stickers, the buyer is unlikely to purchase the Plaintiff's idea book, since he or she has already purchased one from the Defendants. As a consequence, we conclude that this factor weighs heavily in favor of a finding that the Defendants' use was not fair.

c. Conclusion. Having concluded, as a matter of law, that each of the fair use factors commends the extension of copyright protection to the Plaintiff's stickers, and derivative products, we grant Summary Judgment to the Plaintiff on the issue of copyright infringement liability, and next consider whether the Plaintiff is now entitled to the award of injunctive relief that is also requested.

3. The Plaintiff's Motion for Permanent Injunction.

The Plaintiff requested that, in the event that we concluded that the Defendants were infringing upon its copyrights, we issue an Order enjoining the Defendants from the further publishing, importing, distributing, or selling, of any products that display the Plaintiff's sticker designs. Under the Copyright Act, "[a]ny court having jurisdiction of a civil action arising under this title may * * * grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." Title 17 U.S.C. §502(a). "In copyright actions, the plaintiffs generally obtain a permanent injunction when an infringement and liability have been established if there is a threat of continuing violations." Cass County Music Co. v. C.H.L.R., Inc., 896 F.Supp. 904, 911 (E.D. Ark. 1995), rev'd on other grounds, Cass County Music Co. v. C.H.L.R., Inc., supra.

We have already concluded that there was both infringement, and liability for that infringement, leaving the question of whether there is a continuing threat of infringement. On the Record presented, there is insufficient evidence to determine that there is a substantial likelihood that the Defendants will continue to infringe upon the Plaintiff's copyrights. For example, we are unable to ascertain, given this Record, whether the Defendants have disposed of all of the infringing Idea Books, and accordingly, we are unable to hold that the likelihood of future infringement, as to the copyrights at issue here, is substantial. See, Harolds Stores, Inc. v. Dillard Dept. Stores, Inc., 82 F.3d 1533 (10th Cir. 1996)(finding no probability of continued infringement when the infringing party had disposed of all of the infringing skirts). Further, we have been presented with no evidence suggesting any probability that the Defendants will infringe upon the Plaintiff's future copyrighted sticker designs. Id.; Cross Keys Publishing Co. v. LL Bar T Land & Cattle Co., Inc., 887 F.Supp. 219 (E.D. Mo. 1995)(finding permanent injunction warranted where defendants had operated, and continued to operate, a business without the required license, and the evidence demonstrated that they planned on not obtaining a license.); see also, Starter Corp. v. Converse, Inc., 170 F.3d 286, 298 (2nd Cir. 1999)(affirming District Court's refusal

to enter permanent injunction as there was no likelihood of future infringement).

Accordingly, at this time, we deny the Plaintiff's request for the entry of a Permanent Injunction, but we do so without prejudice to the Motion's renewal, upon a proper showing.

B. Antioch's Motion for Summary Judgment as to the Defendants' Counterclaims.

1. The Defendants' Antitrust Claim. The Defendants have alleged that "the Plaintiff's actions in bringing this lawsuit amount to an attempt to establish monopoly power and/or maintain monopoly power of the market for books which teach how to make designs using commercially-available stickers, in violation of Minn. Stat. §352D.52, by misuse of its asserted copyrights in the Creative Memories stickers." Notably, the Defendants limit their antitrust claim to a violation of Minnesota law, as they have alleged no Federal antitrust violation.

The issue presented, at least to the extent of our considerable research, involves a question of first impression under Minnesota law. In effect, the Defendants allege that the filing of this action constituted "'sham litigation,' intended to disguise anti-competitive activity." Schoolhouse, Inc. v. Anderson, 2001 WL 1640081 at *7 (D. Minn., November 8, 2001), aff'd, 275 F.3d 726 (8th Cir. 2002), citing California Motor Transp. Co. v. Trucking Un-

limited, 404 U.S. 508 (1972). As the Court observed in Schoolhouse, "[g]enerally, only litigation brought as a mere sham, to cover what is actually nothing more than an attempt to interfere with business relationships of a competitor, is open to antitrust counterclaim actions." Id. The Court went on to address the Noerr-Pennington doctrine, under which, "the act of bringing litigation is generally privileged," under the First Amendment to the United States Constitution, "from antitrust liability." Id., citing Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657 (1965).

As our Court of Appeals has also explained:

> [T]he First Amendment generally immunizes the act of filing a lawsuit from tort liability under the Noerr-Pennington doctrine. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). See also Hufsmith v. Weaver, 817 F.2d 455, 458-59 (8th Cir. 1987)(holding that doctrine not limited to antitrust context). Only "sham" lawsuits fall outside the Noerr-Pennington cloak of immunity, that is, "only where a defendant's resort to the courts is accompanied or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process * * *." Razorback Ready Mix Concrete Co. v. Weaver, 761 F.2d 484, 487 (8th Cir. 1985). A lawsuit

> is a "sham" if it is both (i) objectively baseless in that no reasonable litigant could expect success on the merits and (ii) subjectively motivated by bad faith. See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 61-62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1080 n. 4 (8th Cir. 1999).

The State Courts of Minnesota have not adopted the Noerr-Pennington doctrine in a State antitrust action, or in any other action. See, Kellar v. VonHoltum, 568 N.W.2d 186, 192 (Minn.App. 1997), rev. denied (Minn., October 31, 1997)(discussing Noerr-Pennington doctrine at length, but concluding that, "[r]esolution of the issues here presented, however, does not require that we announce adoption of the Noerr Pennington doctrine by Minnesota courts."); cf., Robb Gass Construction, Inc. v. Dropps, 2001 WL 436182 at *6 n. 6 (Minn.App., May 1, 2001); but cf., Knudson/Walters v. Viking Center, 1989 WL 151848 at *2 (Minn.App., December 19, 1989)("[The plaintiff] also claims that [the defendants] conspired to tortiously interfere with [the plaintiff's] contractual relations by improperly lobbying the Richfield City Council," but "[t]he involvement of [defendants] with the Richfield city council, even taken as true, reflects activity which is protected by the first amendment guarantee of the right to petition government."), citing United Mine Workers v. Pennington, supra at 669-70, and Eastern

Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra at 136-38.

Notwithstanding the absence of apposite Minnesota authority, we have no hesitation in concluding that, if faced with the question, the Minnesota Courts would apply the Noerr-Pennington doctrine to a Minnesota antitrust claim. The First Amendment, upon which Noerr-Pennington is predicated, is binding upon the States by virtue of the Fourteenth Amendment's Due Process Clause, and we have no reason to believe that the Minnesota Courts would reject a constitutional holding by the Supreme Court of the United States. See, Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 761 n. 3 (1973)("The provisions of the First Amendment have been made binding on the States through the Due Process Clause of the Fourteenth Amendment."), citing Murdock v. Pennsylvania, 319 U.S. 105 (1943); Montano v. Hedgepeth, 120 F.3d 844, 848 (8th Cir. 1997)("First Amendment * * * is binding on the states by virtue of the Fourteenth Amendment's Due Process Clause * * *."), citing United Brotherhood of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 831 (1983).

Moreover, "Minnesota antitrust laws are interpreted consistently with the federal antitrust laws." TRI, Inc. v. Boise Cascade Office Products, Inc., 315 F.3d 915, 919 n. 2 (8th Cir. 2003), citing Minnesota Twins P'ship v. State ex rel. Hatch, 592 N.W.2d

847, 856 (Minn. 1999), cert. denied, 528 U.S. 1013 (1999); Group Health Plan, Inc. v. Philip Morris, Inc., 188 F.Supp.2d 1122, 1127 (D. Minn. 2002)(noting "that Minnesota courts have repeatedly stated that Minnesota's antitrust statute is to be interpreted consistently with Federal court's construction of Federal antitrust law whenever possible * * *."), citing Minnesota Twins P'ship v. State ex rel. Hatch, supra at 851, and State by Humphrey v. Alpine Air Prods., Inc., 490 N.W.2d 888, 894 (Minn.App. 1992), aff'd, 500 N.W.2d 788 (Minn. 1993); see also, State v. Duluth Board of Trade, 107 Minn. 506, 517, 121 N.W. 395, 399 (1905). Accordingly, our analysis turns to the Noerr-Pennington doctrine, as explicated under Federal law.

As we have noted, "[u]nder the Noerr-Pennington doctrine, the act of filing a lawsuit is immune from antitrust or tort liability 'unless it is found to be a mere sham intended to disguise tortious or anti-competitive liability.'" C&A Plus, Inc. v. Plastic Specialties Mfg., Inc., 2003 WL 21729963 at *15 (D. Minn., July 23, 2003), quoting Datascope Corp v. Vascular Solutions, Inc., 165 F.Supp.2d 933, 936 (D. Minn. 2001). The United States Supreme Court has set forth a two-step test to define when litigation may be categorized as "sham litigation." In order to be found a sham, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the

merits." Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60 (1993). Only if that element is satisfied, does the Court move on to the second step, where the Court considers the litigant's motive in bringing the action, so as to determine whether it was an attempt to directly interfere with the business relationships of a competitor, through the use of the governmental process. Id. at 60-61; see also, West Professional Educ. Group, Inc. v. Harcourt Brace Legal and Professional Publications, Inc., 1995 WL 422651 at * 8 (D. Minn., June 2, 1995) ("Notably, the two parts of the Court's test operate in succession only if the suit is found to be objectively baseless may the Court proceed to an examination of the litigant's subjective intent."). In setting forth the test, however, the Supreme Court made it clear, that "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." Id. at 60 n. 5. Accordingly, since we have found in the Plaintiff's favor, on the issue of copyright infringement liability, we conclude that, as a matter of law, the Defendants' antitrust Counterclaim cannot stand, and we grant that aspect of the Plaintiff's Summary Judgment Motion.

2. The Defendants' Copyright Misuse Claim. As a Counterclaim, the Defendants have alleged that the Plaintiff wrongfully attempted to extend its copyright protection, beyond that which was

allowable by law, and that, as a result, the Defendants have been harmed by having to defend themselves against the Plaintiff's "insupportable Amended Complaint." The Plaintiff moves for Summary Judgment on that Counterclaim, on the ground that there is no authority, in any Circuit, to support the existence of such a cause of action, and that the only time that copyright misuse has been seen, is in the form of an equitable defense to an infringement charge.

Accordingly, the Plaintiff argues that the Defendants have failed to state a viable claim for copyright abuse. In response, the Defendants contend that, irrespective of how their allegations of copyright misuse are characterized -- whether as a claim for relief, or as an affirmative defense -- their assertion of copyright abuse is still viable. The Defendants maintain that they have raised a genuine issue of material fact, sufficient to bar the entry of Summary Judgment on this Counterclaim.

A similar counterclaim of abuse of copyright was alleged in Schoolhouse, Inc. v. Anderson, supra at *7, where the Court questioned whether the defendant had stated a claim, and noted that "abuse of copyright is generally recognized as an equitable defense to a copyright infringement claim and is rarely recognized as an independently justiciable cause of action." Id., citing Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 973 (4th Cir. 1990); M. Witmark & Sons v. Jensen, 80 F.Supp. 843, 850 (D. Minn. 1948)

(abuse of copyright recognized as an affirmative defense but only where the party unlawfully exceeds or tries to extend copyright beyond its proper scope); Warner/Chappel Disc, Inc. v. Pilz Compact Disc, Inc., 1999 WL 999332 at *6 n. 5 (E.D. Pa., October 26, 1999)(refusing to allow an affirmative claim of copyright abuse to proceed, because there was no "authority in this Circuit for such a claim, and virtually no authority in any Circuit for such a claim either," so "[t]he Court is not persuaded that this is a viable claim.").

We need not resolve that issue now, however, for, whether we find that the Defendants' allegations state "an independently justiciable cause of action," or we view them as an affirmative defense, in which the Defendants argue that "their infringement is justified under equity because the copyright holder was enforcing its rights in copyrighted material in such a way as to violate antitrust laws of public policy," we would find that the Plaintiff was entitled to Judgment, as a Matter of Law, in any event. Id. Since we have concluded, that "no antitrust violations have occurred," "[p]erforce [the D]efendants' copyright misuse claim must also fail." Hutchinson Telephone Co. v. Fronteer Directory Company of Minnesota, 1987 WL 14101 at *5 (D. Minn., August 18, 1987). Given our previous findings, both as to the Defendants' liability for copyright infringement, and as to the antitrust claims, we

conclude that the Plaintiff "initiated this copyright infringement claim under the good faith belief * * * that [the D]efendant[s] were] infringing upon [the P]laintiff's valid copyright rights." Schoolhouse, Inc. v. Anderson, supra at *7. Accordingly, we recommend that the Plaintiff's Motion for Summary Judgment also be granted, as to that Counterclaim.

3. The Defendants' Consumer Fraud Counterclaim. Next, the Plaintiff seeks Summary Judgment on the Defendants' Minnesota Consumer Fraud Act ("CFA") Counterclaim. In this respect, the Defendants assert that the "Plaintiff has falsely stated in public that its copyrighted works are being made available to the public in a manner permitting 'mass duplication', so as to harm the livelihood of [the] Plaintiff's independent consultants." First Amended Answer and Counterclaims, at 11. The Defendants allege that those statements were made in an attempt to interfere with the Defendants' sale of their Idea Books. According to the Defendants, those statements caused "uncertainty and difficulty," which forced the Defendants to withdraw their Idea Books from retail distribution, such that the Defendants have lost sales as a result of those statements. In addition, the Defendants have produced some evidence that the Plaintiff's statements dissuaded consumers from buying the Defendants' Idea Books.

Therefore, the Defendants allege that, in publishing those statements, the Plaintiff violated Minnesota Statutes Section 325F.69, which provides as follows:

> The act, use, or employment by any person of any fraud, false pretence, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

Minnesota Statutes Section 325F.69, Subdivision 1.

The Plaintiff counters, however, that any actionable statement must be made in the connection with a sale of merchandise, and that there must be some direct link between the allegedly wrongful conduct, and a merchandise transaction, between a buyer and seller. Under this reading, the Plaintiff argues that the Defendants' claim fails as a matter of law, because the Plaintiff's statements were not made as part of a consumer transaction. Responding, the Defendants argue that the Plaintiff's statements did affect consumer transactions, as they were made to consumers, and resulted in the Defendants losing sales, and therefore, they properly state a claim under the CFA.

The CFA is somewhat complex in its application, and it is important to understand the Statute's purpose. The Minnesota Supreme Court has stated that the purpose underlying the CFA is to "prohibit deceptive practices and to address the unequal bargaining

power often present in consumer transactions." Ly v. Nystrom, 615 N.W.2d 302, 308 (Minn. 2000), citing State by Humphrey v. Philip Morris Inc., 551 N.W.2d 490, 496 (Minn. 1996). As such, the CFA "provides the attorney general with the authority to seek and obtain injunctive relief to protect consumers from unlawful and fraudulent trade practices in the marketplace." Id.

However, the Attorney General's authority to seek such relief is not found in the CFA itself, but rather, arises from Minnesota Statutes Section 8.31, which invests the Attorney General with the authority to seek relief, on behalf of the State, "regarding unlawful business practices barred by a variety of statutory prohibitions, including the [CFA]." In addition to granting such power to the Attorney General, Minnesota Statutes Section 8.31, Subdivision 3a -- better known as the Private Attorney General Statute -- "provides that 'any person injured by a violation' of the laws entrusted to the attorney general to investigate and enforce," including the CFA, "may recover damages together with costs and attorney fees." Id. at 310. Section 8.31, Subdivision 3a, is the provision which authorizes entities, such as the Defendants, to commence actions under the CFA.

The Defendant's CFA claims fail on two different bases. First, the CFA "protects consumers, not sellers." Popp Telcom, Inc. v. American Sharecom, Inc., 2003 WL 1610789 at *8 (D. Minn.,

March 20, 2003), citing Group Health Plan, Inc. v. Philip Morris, Inc., 68 F.Supp.2d 1064, 1069 (D. Minn. 1999); Flora v. Firepond, Inc., 260 F.Supp.2d 780, 787 (D. Minn. 2003)(recognizing that there must be a direct nexus between the alleged wrong and the sale of merchandise), citing Cooperman v. R.G. Barry Corp., 775 F.Supp. 1211, 1213 (D. Minn. 1991); Keckhafer v. Prudential Insur. Co., 2002 WL 31185866 at *12 (D. Minn., October 1, 2002)(same). Indeed, as we have stated, elsewhere, "we continue in the view that, since [the plaintiff] is not a consumer, she has no protections under [either Minnesota Statutes Sections 325F.67 and .69]." Kovatovich v. K-Mart Corp., 88 F.Supp.2d 975, 985 n. 4 (D. Minn. 1999), citing Marvin Lumber and Cedar Co. v. PPG Indus., Inc., 1998 WL 1056973 at *47 (D. Minn., August 6, 1998), adopted as modified on other grounds, Marvin Lumber and Cedar Co. v. PPG Indus., Inc., 34 F.Supp.2d 738 (D. Minn. 1999), aff'd, 223 F.3d 873, 887 (8th Cir. 2000), citing Ly v. Nystrom, supra at 647, for the proposition that "§325F.69 does not protect merchants."

We understand the Defendants to allege that they lost sales by the comments of the Plaintiff, of which they complain, but those comments were not made in reference to a sale of merchandise by the Plaintiff to the Defendants. In the absence of an allegation, that the purportedly wrongful statements were a part of such a consumer sales transaction, between the Plaintiff and the Defendants, the

Defendants' Counterclaim is an "unwarranted and unsupported use of the []CFA." Popp Telcom, Inc. v. American Sharecom, Inc., supra at *8, citing Group Health Plan, Inc. v. Philip Morris, Inc., supra at 1069. Therefore, the Plaintiff is entitled to Summary Judgment on the Defendants' CFA Counterclaim.

Even if the CFA claim were otherwise appropriate, we would, nonetheless, be obligated to grant Summary Judgment to the Plaintiff because the Minnesota Private Attorney General Statute, Minnesota Statutes Section 8.31, Subdivision 3(a), requires that the action, under its aegis, be for the public benefit. In Ly v. Nystrom, supra at 314, the Minnesota Supreme Court reasoned as follows:

> [T]he legislature could not have intended to sweep every private dispute based on fraud, and falling within the CFA, into a statute where attorney fees and additional costs and expenses would be awarded, because to do so would substantially alter a fundamental principle of law deeply ingrained in our common law jurisprudence -- that each party bears his own attorney fees in the absence of a statutory or contractual exception.

Ultimately, the Court held that "the Private AG Statute applie[d] only to those claimants who demonstrate that their cause of action benefits the public." Id. No such public benefit is either alleged, or apparent, here.

As noted, the Defendants have alleged that the "Plaintiff has falsely stated in public that its copyrighted works are being made available to the public in a manner permitting 'mass duplication,' so as to harm the livelihood of Plaintiff's independent consultants." First Amended Answer and Counterclaims, at p. 11, para. 91. According to the Defendants, the "Plaintiff has employed these misrepresentations and misleading statements in an attempt to interfere with [the] sale of Defendants' Books by Defendants," and "[t]hose misrepresentations and misleading statements have interfered with Defendants['] sale of Defendants' Books." Id. at p. 11, paras. 92 and 93. Given these allegations, the Defendants contend that they are entitled to damages, and attorneys' fees, under the CFA, by means of the Minnesota Private Attorney General Statute. Id. at 11, para. 94. While couched as a CFA claim, the alleged wrong, which was assertedly committed by the Plaintiff, was a private wrong for which the Defendants claim to have been damaged.

As we have recently explained:

> While we understand the Plaintiffs' argument, that there might be some benefit to the public occasioned by their success in this action, we cannot agree that such a metaphysical potential is sufficient to satisfy the public benefit requirement enunciated in Ly v. Nystrom. To be sure, the loss of any false advertising claim might counsel the advertiser to be more forthright in its advertisement of its other products, we see no real prospect of a public benefit, other than a theoretical one.

Behrens v. United Vaccines, Inc., Div. of Harlan Sprague Dawley, Inc., 228 F.Supp.2d 965, 971 (D. Minn. 2002), citing Transclean Corp. v. Bridgewood Services, Inc., 134 F.Supp.2d 1049, 1054 (D. Minn. 2001), aff'd in relevant part, 290 F.3d 1364, 1379 (Fed. Cir. 2002); see also, Davis v. U.S. Bancorp, 2003 WL 21730102 at *4 (D. Minn., July 23, 2003)("To bring a cause of action under [Section 325F.69 and Section 8.31], [the plaintiff] must satisfy the requirements of the Private Attorney General Statute, Minn.Stat. §8.31, subd. 3a," and "must show that here causes of action benefit the public," and "[b]ecause the damages that [the plaintiff] requests are for personal benefit only, [the plaintiff] cannot meet this requirement, and her claims must be dismissed.'); Tuttle v. Lorillard Tobacco Co., 2003 WL 1571584 at *5-6 (D. Minn., March 3, 2003); Pecarina v. Tokai Corp., 2002 WL 1023153 at *5 (D. Minn., May 20, 2002)(denying CFA claim, in a products liability claim, which involved personal injuries to a child, arising from the sale of a lighter, because of the lack of a public benefit).

As a result of the absence of any public benefit attributable to the Defendants' CFA Counterclaim, we find that an award of Summary Judgment to the Plaintiff, on that same ground, is also warranted here.

NOW, THEREFORE, It is --

ORDERED:

1. That the Plaintiff's Motion for Summary Judgment as to Liability for Copyright Infringement [Docket No. 67] is GRANTED, except to the extent that the Plaintiff requested the entry of a Permanent Injunction, which is DENIED, but without prejudice.

2. That the Plaintiff's Motion for Summary Judgment as to the Defendants' First, Second, and Fourth Counterclaims [Docket No. 70], is GRANTED, in its entirety.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE